IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SPECTRUM HEALTHCARE RESOURCES, INC., <br> Plaintiff, <br><br> v. <br><br> INGENESIS ARORA MILITARY, LLC, <br> Defendant. | Case No. 1:12-cv-645 |

## MEMORANDUM OPINION

In this diversity declaratory judgment action, a threshold motion presents the question whether the matters as to which declarations are sought must be submitted to an arbitrator pursuant to an arbitration clause in a subcontract between the parties. For the reasons stated herein, arbitration is required, and the matter must be stayed pending the arbitration.

I.[1]

Plaintiff Spectrum Healthcare Resources, Inc. ("Spectrum") is a company incorporated under the laws of Delaware with its principal place of business in St. Louis, Missouri. Defendant, InGenesis Arora Military, LLC ("IAM") is a Texas limited liability company that has its principal place of business in San Antonio, Texas. IAM is comprised of two members, InGenesis, Inc. and The Arora Group, Inc. InGenesis, Inc. is incorporated in Texas and has its principal place of business in Texas. The Arora Group, Inc. is incorporated in Maryland and has its principal place of business in Maryland.

On April 16, 2009, the U.S. Army Medical Command Center for Health Care Contracting, Department of Defense ("Army") issued a request for proposals, W81K04-09-R-

---

[1] The facts recited herein are derived chiefly from plaintiff's First Amended Complaint for Declaratory Relief ("FAC") (Doc. 6).

1

0002 ("RFP") to provide family health center facilities and services to military beneficiaries at two Family Health Centers in Northern Virginia. Before submitting a proposal to the Army in response to the RFP, Spectrum entered into a subcontract with IAM dated May 12, 2009 (the "Subcontract"), under which IAM would provide certain services to Spectrum as a subcontractor in the event Spectrum was awarded the prime contract with the Army.

Included in the Subcontract and particularly pertinent here is the arbitration clause at issue, which provides that:[2]

> [a]ny dispute not disposed of in accordance with the [Contracting Officer dispute resolution] provision shall be determined in binding arbitration, before a single arbitrator under the Commercial Rules of the American Arbitration Association, and any judgment may be entered upon any arbitration award in any court of competent jurisdiction.

Also included in the Subcontract and pertinent here is a termination clause, which states that, "[t]he term of this Subcontract is concurrent with that of the Prime Contract."

On September 23, 2009, the Army awarded the original prime contract to Spectrum under contract number W81K04-09-C-0006 (hereinafter "Prime Contract 6"). In June of 2010, CRAssociates, Inc. ("CRA"), a competing bidder on the RFP won by Spectrum, filed a complaint in the Court of Federal Claims protesting the award of Prime Contract 6 to Spectrum. This protest succeeded; the Court of Federal Claims found that the Army had failed to perform a required analysis in awarding Spectrum the contract. As a result, the Court of Federal Claims enjoined Spectrum from "performing or allowing others to perform on the contract awarded

---

[2] The Subcontract also provides for a dispute resolution process to govern disputes that may arise when the Army's Contracting Officer renders a decision under the Prime Contract that has an effect on the Subcontract. This provision has no application here, as the dispute in this case is unrelated to any Contracting Officer decision.

pursuant to (RFP) No. W81K04-09-R-002." The effective date of the Army's final stop work order on Prime Contract 6 was June 30, 2011.

Following the termination of Prime Contract 6, the Army and Spectrum began negotiating a new contract under the same RFP, and in the end, the Army issued a new contract to Spectrum on June 16, 2011, known as contract W81K04-11-C-0012 (hereinafter "Prime Contract 12"). Following CRAssociates' unsuccessful protest of the Army's award of Prime Contract 12 to Spectrum, Spectrum and IAM attempted unsuccessfully to negotiate a new subcontract for work under Prime Contract 12. Although Spectrum and IAM were unable to reach agreement on a new subcontract, IAM, noting that the Subcontract refers only to a "Prime Contract" and not specifically to Prime Contract 6, contends that the Subcontract remains in effect now under Prime Contract 12. Given this assertion, Spectrum issued notices of material default to IAM under the Subcontract.

Spectrum disputes IAM's contention that the Subcontract remains in effect, arguing that the Subcontract ended with the termination of Prime Contract 6. In view of this disagreement, Spectrum filed this declaratory judgment action seeking three declarations on three claims. Specifically, Spectrum, in its FAC, seeks the following declarations:

> 1. "[T]hat Spectrum and IAM never formed, or entered into, a subcontract agreement with respect to or in connection with contract W81K04-11-C-0012 or for work to be performed by IAM as a subcontractor on contract W81K04-11-C-0012;" FAC ¶ 38.
>
> 2. "[T]hat the term of the [Subcontract] as amended has ended and it no longer imposes any binding obligations on the parties to each other;" FAC ¶ 43, and
>
> 3. Finally, in the alternative, if the Subcontract is found to continue to bind the parties, that "IAM has materially defaulted in its obligations pursuant to the [Subcontract], and Spectrum is therefore excused from performance under the [Subcontract] and is entitled to terminate the [Subcontract]." FAC ¶ 45.

3

**II.**

IAM contends that Spectrum's requests for declarations of rights concern disputes which must be arbitrated under the Subcontract's arbitration clause, and thus the case should be dismissed or stayed pending the arbitration of the disputes. Spectrum counters that the Subcontract's arbitration clause is no longer in effect, as the Subcontract ended at the time Prime Contract 6 was terminated. The question presented therefore is whether the matters on which declarations are sought are subject to arbitration under the Subcontract's arbitration clause.

The Supreme Court and the Fourth Circuit have made clear that the analysis that governs whether a particular dispute is arbitrable proceeds in two steps. First, a court must decide whether the court or the arbitrator determines whether the dispute is arbitrable. Second, in the event the court is the proper entity to decide the arbitrability of the dispute, then the court must next determine whether the dispute is arbitrable, namely whether the dispute falls within the ambit of the contractual arbitration clause. *Peabody Holding Co., LLC v. United Mine Workers of America, International Union*, 665 F.3d 96, 101 (4th Cir. 2012).

And in this respect, the Supreme Court has articulated four principles to guide courts in performing this two-step analysis. First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). Next, the Supreme Court stated that the second principle, "which follows inexorably from the first, is that the question of arbitrability...is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* at 649. The third principle,

4

according to the Spectrum Court, is that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Id.* The fourth governing principle—and arguably the most important—is that "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* at 650 (quoting *Warrior & Gulf*, 363 U.S. at 582-83.) Simply put, "[d]oubts [about arbitration] should be resolved in favor of coverage." *Id.*

The first step in the arbitration analysis—whether the court or the arbitrator determines whether a particular dispute is arbitrable—is fairly easy. The Supreme Court teaches that there must be a provision in an agreement's arbitration clause that "clearly and unmistakably" provides that the arbitrator determines the scope of his own jurisdiction in order to negate the presumption that the court decides the scope of the arbitrator's jurisdiction. *AT&T Technologies*, 475 U.S. at 649; *Peabody Holding Co.*, 665 F.3d at 102; *Virginia Carolina Tools, Inc. v. International Tool Supply, Inc.*, 984 F.2d 113, 117 (4th Cir. 1993). Additionally, the Fourth Circuit has found the "clearly and unmistakably" standard to be "exacting" and has said that a broad arbitration clause that does not specifically address who is to decide the scope of arbitration will not be sufficient to overcome the presumption that the decision is for the court, not the arbitrator. *Peabody Holding Co.*, 665 F.3d at 102. Here, the Subcontract contains no such "clear and unmistakable" provision conferring on the arbitrator the power to decide whether or not the disputes are arbitrable. Thus, the standard articulated in *AT&T Technologies* and *Peabody Holding Co.* is not met here, and it follows that in this case, the court, not the arbitrator, must decide whether the disputes are arbitrable.

The second step in the arbitration analysis—whether the disputes are arbitrable—is not so easy. To begin with, it is important to recognize that although the FAC sets out three disputes in three counts, these disputes, in fact, are not separate, but are instead closely related, indeed inextricably entwined, given that resolution of one of these disputes may affect the resolution of the other two. In this regard, all three disputes turn on the question of whether the Subcontract survived the termination of Prime Contract 6, and as IAM contends, remained operative once Spectrum entered into Prime Contract 12 with the Army. Specifically, IAM argues that the Subcontract remains operative with respect to Prime Contract 12 because the Subcontract refers only generally to the "Prime Contract" without limiting this term to Prime Contract 6. Thus, IAM argues that the Subcontract's reference to the "Prime Contract" should be construed to include Prime Contract 12. If the Subcontract is so construed, IAM argues that the Subcontract is still operational and thus the Subcontract's arbitration clause applies. This conclusion impacts all three requested declarations. Of course, a contrary conclusion—the conclusion that the term "Prime Contract" in the Subcontract refers only to Prime Contract 6 and should not be construed to include Prime Contract 12—would have the opposite effect and result in the conclusion that the Subcontract and its arbitration clause expired with the termination of Prime Contract 6. In other words, the focus of the arbitrability question should be on whether the Subcontract term "Prime Contract" is ambiguous and should be construed as Spectrum argues or instead as IAM argues. Given that the arbitration question focuses on the construction of a term in the Subcontract, and given that there is a strong presumption in favor of arbitrability under the Federal Arbitration Act, there is little doubt that the Subcontract's arbitration clause encompasses such a dispute. Accordingly, the parties' dispute is clearly arbitrable.

Spectrum, seeking to avoid this result, argues that the analysis never reaches the question of the meaning of the term "Prime Contract" as used in the Subcontract because settled Fourth Circuit authority makes clear that the arbitrability question is properly decided by reference to the fact that Prime Contract 6 was terminated and thus the Subcontract, which by its terms was to be coterminous with the Prime Contract, was also terminated at that time. Hence, Spectrum argues that there is no arbitration clause and thus no obligation to arbitrate. Spectrum cites *Virginia Carolina Tools* in support of this argument. IAM counters by arguing that *Peabody Holding Co.*, not *Virginia Carolina Tools*, should govern and that case dictates a contrary result.

In the end, it is *Peabody Holding Co.*, not *Virginia Carolina Tools* that is more persuasive in this context because here, as in *Peabody Holding Co.*, the continued application of the arbitration clause hinges on the construction or interpretation of a Subcontract term. And, as *Peabody Holding Co.* teaches, where, as here, the duration of the contract depends upon the interpretation of a term in the contract, the presumption in favor of arbitrability controls and arbitration is required.

This result is confirmed by the contrast between *Virginia Carolina Tools* and *Peabody Holding Co.* In *Virginia Carolina Tools*, a seller of a business declined to submit to arbitration of a dispute concerning the duration of an option agreement that contained both an arbitration clause and a termination provision. There, as here, the court concluded first that the question of arbitrability was for the court, not the arbitrator because the agreement did not clearly and unmistakably confer that power on the arbitrator. *Virginia Carolina Tools*, 984 F.2d at 117. Next, the Fourth Circuit panel, affirming the district court, concluded that the dispute was not subject to arbitration because the option agreement there in issue, in sharp contrast to the Subcontract here in issue, included "a facially unambiguous termination date...." *Id.* at 113 and

7

118-19. Given this, the panel unanimously concluded that there could be no dispute as to the parties' intent as to the agreement's duration. *Id.* at 118.

In sharp contrast to the dispute in *Virginia Carolina Tools*, the dispute in *Peabody Holding Co.* concerning the Jobs Agreement between the parties did not involve the application of a fixed termination date; instead, the dispute in that case focused on whether the Jobs Agreement was still operative for the remaining Peabody entities when the signing entity had been sold. In this respect, the Fourth Circuit panel unanimously concluded that the Jobs Agreement was at best ambiguous and thus that the well-established presumption in favor of arbitrability operated to require arbitration. *Peabody Holding Co.*, 665 F.3d at 105.

As is apparent, this case presents an arbitrability question closely akin to that presented in *Peabody Holding Co.* Like the Jobs Agreement in *Peabody Holding Co.*, and unlike the option agreement in *Virginia Carolina Tools*, the Subcontract is ambiguous as to the arbitrability issue. More specifically, the meaning of the term "Prime Contract" in the Subcontract is ambiguous; it is unclear whether the meaning of that term is limited to Prime Contract 6, or instead encompasses any prime contract that covers the same scope of work, including Prime Contract 12. Importantly, resolution of this ambiguity is fundamental to all three declarations Spectrum seeks in the FAC. Given this ambiguity, the well-established presumption in favor of arbitrability operates to compel arbitration.

To be sure, as both Fourth Circuit panels in *Peabody Holding Co.* and *Virginia Carolina Tools* recognized, the arbitrability question is, in the end, a question of the parties' intent. Where, as in *Virginia Carolina Tools*, the parties' intent on the arbitrability question is beyond dispute by virtue of a facially unambiguous termination provision, there can be no obligation to arbitrate. But where, as in this case, an ambiguity exists that goes to the parties' intent as to the

duration and application of the Subcontract, the ambiguity must be resolved in arbitration, not in court.

Spectrum argues that the parties clearly intended that the Subcontract end with the termination of Prime Contract 6 and invites this Court to reach this conclusion given that Spectrum and JAM attempted and failed to reach agreement on a new subcontract relating to Prime Contract 12. This invitation must be declined; to accept it would result in an impermissible judicial excursion into the merits of the precise matter that must be arbitrated.

In sum, the question of arbitrability of the matters as to which Spectrum seeks declarations is for the Court not the arbitrator. And given the Subcontract's ambiguity on the arbitrability question, the presumption in favor of arbitration compels the conclusion that the parties' disputes must be submitted to arbitration. Accordingly, an Order will issue compelling the parties to submit their disputes to arbitration in accordance with the provisions of the Subcontract. And, consistent with the Federal Arbitration Act, 9 U.S.C. § 3, this case will be stayed and placed among the inactive matters rather than dismissed.

Alexandria, Virginia
September 24, 2012

/s/
T. S. Ellis, III
United States District Judge